**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 30, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RIO GRANDE FOUNDATION,

    Plaintiff - Appellant,

and

ILLINOIS OPPORTUNITY PROJECT,

    Plaintiff,

v.

MAGGIE TOULOUSE OLIVER, in her official capacity as Secretary of State of New Mexico,

    Defendant - Appellee.

No. 24-2070
(D.C. No. 1:19-CV-01174-JCH-JFR)
(D. N.M.)

_____

**ORDER**
_____

Before **HOLMES**, Chief Judge, **HARTZ**, **TYMKOVICH**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **McHUGH**, **MORITZ**, **EID**, **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.

_____

This matter is before the court on *Appellant's Petition for Rehearing En Banc* ("Petition") and *Appellee's Response to Petition for Rehearing En Banc* ("Response"). The Petition and Response were transmitted to all judges of the court who are in regular active service, and a poll was called. A majority of the participating judges voted to deny the Petition. Accordingly, the Petition is DENIED pursuant to Fed. R. App. P. 40(c).

Judge Tymkovich and Judge Eid would grant rehearing en banc. Judge Eid has filed a separate dissent from the denial of en banc rehearing, which is joined by Judge Tymkovich.

Randy Elf's *Amicus's Motion for Leave to File An Amicus Brief* (Doc. No. 62) is DENIED. In addition, Mr. Elf's *Amicus's Motion to Withdraw Motion and Brief Submitted June 30, 2024* (Doc. No. 67) is DENIED AS MOOT in light of the court's previous denial of the motion (Doc. No. 22) Mr. Elf seeks to withdraw.

Entered for the Court,

PER CURIAM

No. 24-2070, *Rio Grande Foundation et al. v. Oliver*

**EID**, Circuit Judge, dissenting from denial of petition for rehearing en banc, joined by **TYMKOVICH**, Circuit Judge.

The First Amendment protects the right to speak anonymously. As the Supreme Court held in *McIntyre v. Ohio Elections Commission*, such speech is part of our nation's "honorable tradition of advocacy and of dissent." 514 U.S. 334, 357 (1995). Perhaps most famously, this includes advocacy for the ratification of the Constitution itself by "Publius," the collective pseudonym used by Alexander Hamilton, James Madison, and John Jay when writing the *Federalist Papers*. *See Federalist Papers*, *Black's Law Dictionary* (12th ed. 2024); *see also McIntyre*, 514 U.S. at 343 n.6 (detailing other anonymous political writings from the Founding Era).

Moreover, this protection is consistent with the original understanding of the First Amendment. *See McIntyre*, 514 U.S. at 360–67 (Thomas, J., concurring in the judgment). For example, the Continental Congress rejected a request by delegate Elbridge Gerry to force the editor of the *Pennsylvania Packet* to disclose the identity of "Leonidas," the pseudonymous author of an article attacking the Continental Congress for causing the then-rampant inflation, on the grounds that this would "invade[] the freedom of the press." *Id.* at 361. Additionally, during the Ratification period, Anti-Federalists successfully rallied the public against Federalist editors who refused to publish anonymous articles by invoking the specter of the federal government imposing a similar prohibition in the absence of a Bill of Rights. *See id.* at 363–67.

1

**No. 24-2070, *Rio Grande Foundation et al. v. Oliver***

The protection of anonymous speech stems from the fact that speech is often stifled in the absence of anonymity—particularly speech by those with unpopular beliefs. After all, "[a]nonymity is a shield from the tyranny of the majority." *Id.* at 357 (majority opinion); *see also Talley v. California*, 362 U.S. 60, 64 (1960) ("Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously *or not at all*." (emphasis added)). Practically speaking, disclosure laws and other efforts to eliminate anonymous speech deter the formation of advocacy organizations, thereby undermining the related First Amendment right "to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Disclosure laws also facilitate retaliation by intolerant members of society opposed to minority groups' political positions. *See Citizens United v. FEC*, 558 U.S. 310, 481 (2010) (Thomas, J., concurring in part and dissenting in part) (discussing retaliation against supporters of a 2008 California ballot measure aimed at amending the state constitution to recognize only heterosexual marriages); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 617 (2021) (noting that these risks "are heightened in the 21st century and seem to grow with each passing year, as anyone with access to a computer can compile a wealth of information about anyone else, including such sensitive details as a person's home address or the school attended by his children" (cleaned up)).

The burdens associated with disclosure laws are particularly illustrated by the facts of this case. Rio Grande Foundation ("RGF") is a charitable organization challenging a provision of New Mexico's Campaign Reporting Act (the "CRA") that

No. 24-2070, *Rio Grande Foundation et al. v. Oliver*

requires the public disclosure of the names and addresses of certain donors if their funds are used to pay for advertisements mentioning a candidate or ballot question in the weeks preceding an election. *See* N.M. Stat. Ann. § 1-19-26(Q)(3)(c) (2025) ("Section (3)(c)"). As the president of RGF testified, he is "personally aware of instances where donors to organizations with similar views were subject to retaliation and harassment, including boycotts, online harassment, and social ostracism." App'x at 179. Given this history, RGF reasonably fears that the disclosure of its donors' information pursuant to Section (3)(c) will cause many of its donors to end their support for the organization.

To account for these real-world harms, the Supreme Court has subjected laws compelling the disclosure of anonymous speakers to the stringent "exacting scrutiny" standard. *Ams. for Prosperity Found.*, 594 U.S. at 607–08. As the Court recently clarified, this standard requires both "a substantial relation between the disclosure requirement and a sufficiently important interest," *Indep. Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016) (quotation marks omitted) (quoting *Citizens United*, 558 U.S. at 366–67), *and* a regime "narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end," *Ams. for Prosperity Found.*, 594 U.S. at 610. This narrow-tailoring requirement gives the exacting scrutiny standard "real teeth," *id.* at 622 (Alito, J., concurring in part and concurring in the judgment), as evidenced by the Court relying upon this prong when striking down California's charitable donor disclosure requirement, *id.* at 615 (majority opinion).

3

No. 24-2070, *Rio Grande Foundation et al. v. Oliver*

Despite this stringent standard of review, the panel majority upholds Section (3)(c)'s expansive disclosure requirements. In particular, they brush aside concerns about the law's tailoring by noting that "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends." *Rio Grande Found. v. Oliver*, 154 F.4th 1213, 1228 (10th Cir. 2025) (quotation marks omitted) (quoting *Bonta*, 594 U.S. at 608). While this is a true statement of the law, it does not resolve the question of narrow tailoring in this case. As I said in dissent, allowing this regulatory scheme to survive exacting scrutiny because the state "made some effort" at tailoring is flatly inconsistent with our responsibility under *Americans for Prosperity Foundation*. *Id.* at 1234 (Eid, J., dissenting).

In particular, the panel majority avoids the problematic reach of the statute by framing the disclosure of certain general-fund donors as merely capturing "large donors giving to a political committee, right before an election, [who] are certain to be aware of the advertisement's political purpose." *Id.* at 1228 (majority opinion). But the CRA is not as targeted as this passage would lead you to believe. Donations to an organization's general fund during an "election cycle"—which is a two-year period starting on January 1st following the last general election, *see* N.M. Stat. Ann. § 1-1-3.1(A)—are subject to disclosure, *id.* § 1-19-27.3(D)(2). As a result, the law requires a sufficiently large general-fund donation made *twenty-two months* before the next general election to be publicly disclosed alongside donations earmarked for independent expenditures during the heat of the campaign. This not only burdens speech tenuously tied to an election, but also muddies the informational signal New

4

No. 24-2070, *Rio Grande Foundation et al. v. Oliver*

Mexico seeks to highlight for the public. After all, most candidates have not yet announced their campaigns and ballot initiatives likely have not yet been certified this far in advance. Further, this example highlights the ineffectiveness of the CRA's opt-out provision: Donors who fail to anticipate that a nonprofit they contributed to will make an independent expenditure *years in the future* are simply out of luck.[1]

The CRA's expansive temporal scope is not the law's only tailoring problem. Another issue arises from subjecting general-fund donors and donors who directly fund a specific advertisement to the same disclosure requirements. *See* N.M. Stat. Ann. § 1-19-27.3(D) (requiring the disclosure of "the name and address of, and amount of each contribution made by" both general and specific donors). As a result, the import of a donor who conditioned their funding on an organization's production of a Section (3)(c) advertisement is likely to be lost in the shuffle of general-fund-donor disclosure. This undermines New Mexico's stated interest in informing the electorate, as members of the public seeking to know who is advocating for or against a candidate or ballot question would underestimate the influence of the specific donor and overestimate the influence of the (presumably more numerous) general donors.

The presence of a clear alternative that addresses New Mexico's interest in an informed electorate further undermines the CRA. *See Ams. for Prosperity Found.*, 594 U.S. at 613 (requiring a state to "demonstrate its need" for a given disclosure law

---

[1] Additionally, the uncertainty surrounding the breadth of Section (3)(c), which includes advertisements "that could be reasonably interpreted as *having or not having* a political purpose," *Rio Grande Found.*, 154 F.4th at 1222 (emphasis added), makes this donor forecasting even more difficult and constitutionally suspect.

No. 24-2070, *Rio Grande Foundation et al. v. Oliver*

"in light of any less intrusive alternatives").  As I highlighted in dissent, we have previously held that "disclosure laws that are limited to 'donors who have specifically earmarked their contributions' for advertisements 'help[] render [a] statute's scope sufficiently tailored.'"  *Rio Grande Found.*, 154 F.4th at 1235 (Eid, J., dissenting) (alterations in original) (quoting *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1248 (10th Cir. 2023)).  Such an earmarking system would not only burden less speech, but also would "better serve[] the state's informational interest."  *Wyo. Gun Owners*, 83 F.4th at 1248.

In sum, I believe Section (3)(c) fails at the narrow-tailoring step of the *Americans for Prosperity Foundation* analysis because it casts far too wide a net.  By requiring the disclosure of certain general-fund donors, the law unnecessarily burdens core political speech, ignores serious concerns of retaliation against donors, and disproportionately harms those who hold unpopular beliefs.  A disclosure law that is not narrowly tailored, by definition, impermissibly suppresses too much constitutionally protected speech and therefore raises "questions of exceptional importance."  Fed. R. App. P. 40(b)(2)(D); *accord* 10th Cir. R. 40.1(B).  Accordingly, I respectfully dissent from the court's order denying en banc review.